

RECEIVED
DEC 01 2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States District Court
Northern District of Illinois Eastern Division

John R. Smith,

Plaintiff,

v.

ROHR-GURNEE MOTORS, INC.,
d/b/a GURNEE VOLKSWAGEN
and d/b/a ROHRMAN AUTOMOTIVE GROUP
Ryan V. Rohrman;
Crystal "Jones" Zaba;
Rocco Perry;
Nebojsa "Nebi" Denic;
Tyler Stein;
David LaBahn;
Manheim Anaheim California (Cox Automotive, Inc.);

Defendants.

Case No. _____
Judge: _____
Jury Trial Demanded

1:25-cv-14631
Judge Matthew F. Kennelly
Magistrate Jeannice W. Appenteng
RANDOM / Cat. 2

## COMPLAINT

Plaintiff John R. Smith ("Plaintiff") brings this action against the above-named Defendants for violations of Illinois consumer-protection law, common-law fraud, civil conspiracy, deceptive business practices, breach of warranty, and related claims arising from the sale of a dangerously repaired total-loss Tesla Model 3 whose salvage history was concealed through improper title laundering and the systematic insertion of unauthorized "dealer service plans" into customer purchases.

Plaintiff alleges as follows:

## PARTIES

### Plaintiff

1. Plaintiff John R. Smith is a natural person residing in Cook County, Illinois.

2. Plaintiff purchased the subject vehicle—a 2022 Tesla Model 3 VIN 5YJ3E1EA9NF142720—from Gurnee Volkswagen on March 17, 2023.

### Defendants

3. Defendant Rohr-Gurnee Motors, Inc., an Illinois Domestic Business Corporation, does business under the assumed names Gurnee Volkswagen, Gurnee VW, and Rohrman Automotive Group. Its principal office is 1510 W. Dundee Road, Arlington Heights, IL 60004.

4. Defendant Rohrman Automotive Group is the enterprise-level trade name used by Rohr-Gurnee Motors, Inc. across all marketing, advertising, signage, digital materials, and retail representations. It is listed as an assumed name with the Illinois Secretary of State.

5. Defendant Ryan V. Rohrman is the President and Secretary of Rohr-Gurnee Motors, Inc. He resides, on information and belief, in the greater Arlington Heights, Illinois area and exercises operational and corporate control over the dealership.

6. Defendant Crystal "Jones" Zaba was the dealership's corporate representative responsible for customer disputes, including the Better Business Bureau ("BBB") arbitration involving Plaintiff's case. She directed internal responses to fraud reports and approved or denied refund authorizations.

7. Defendant Rocco Perry served as General Manager of Gurnee Volkswagen during the relevant time. He had direct responsibility for dealership compliance, customer complaints, sales practices, vehicle acquisition standards, and corrective actions.

8. Defendant Nebojsa "Nebi" Denic served as General Sales Manager. He supervised the sales department and was publicly identified in dozens of consumer complaints as the manager responsible for inserting unauthorized dealer service plans into customer transactions.

9. Defendant Tyler Stein was the salesperson on Plaintiff's transaction. He executed the retail sales documents and participated in the concealment of the salvage condition and unauthorized add-ons.

10. Defendant David LaBahn was the Finance Manager who processed Plaintiff's sales contract. He admitted knowledge that sales managers routinely inserted unauthorized service plans into deals before they reached finance.

11. Defendant Manheim Anaheim California (operated by Cox Automotive, Inc.) is a national wholesaler of vehicles primarily to dealers. Company headquartered in Georgia, registered to do business in California. It received, processed, and sold the vehicle after it left Copart, without flagging its total-loss history, thereby enabling the vehicle to be retailed as undamaged.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and diversity exists between Plaintiff and certain Defendants.

13. Jurisdiction is also proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 for supplemental state-law claims.

14. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because all relevant events occurred here and the primary Defendants reside or transact business within this district.

INTRODUCTION

15. Gurnee Volkswagen and its parent Rohrman Automotive Group engaged in a systemic pattern of deceptive conduct in two interconnected schemes:
- Scheme 1 (Salvage Concealment & Title Washing): reselling total-loss vehicles reconstructed by an unlicensed intermediary, passed through Manheim, and retailed to consumers without disclosure;
- Scheme 2 (Dealer Service Plan Fraud): inserting thousands of dollars in unauthorized add-on products into sales contracts without customer consent.

16. Plaintiff's vehicle is the most egregious example: a Tesla that Hertz declared a total loss, sent to Copart for disposal, and which Copart photographed extensively documenting catastrophic damage. A shell LLC purchased it for cash, performed sub-standard repairs, and passed it through Manheim Anaheim California without Manheim alerting downstream buyers—enabling the dealership to treat it as a clean car.

17. Plaintiff paid full retail price for a car that was unsafe, improperly reconstructed, and ineligible for warranty. He also was charged unauthorized service plans totaling over $6,274.

18. Numerous public complaints, BBB disputes, and dealership-operated "fraud refund websites" demonstrate the dealership's awareness of systemic wrongdoing.

19. Plaintiff brings this action to recover damages, rescission, statutory penalties, punitive damages, and to ensure accountability for the coordinated fraudulent practices carried out by the Defendants in order to protect the public victims from harm.

**A. Total-Loss Declaration and Salvage Chain (Hertz → Copart → V&P Motors → Manheim → Rohrman Group)**

20. On February 21, 2023, Hertz Corporation declared the subject Tesla Model 3 a total loss following a front-end collision.

21. Hertz calculated repair costs exceeding $24,000, including A-frame distortion, structural displacement, and major front-end component destruction.

22. Hertz salvage expert documented that the vehicle was "unsafe for customer repair" and marked it for salvage disposal.

23. Hertz authorized the vehicle for transmission to Copart California a licensed national salvage auction, for destruction or part-out.

24. Hertz's disposition file confirmed that the vehicle was not authorized to re-enter the retail market as a whole vehicle.

25. The Tesla arrived at a Copart facility in California, where Copart performed its standard salvage intake process.

26. Copart photographed the vehicle extensively, capturing dozens of images showing catastrophic structural damage, including crushed A-pillars, missing crash members, broken energy absorbers, bent rails, and displaced hood and fender geometry.

27. Copart assigned the vehicle a salvage designation and auctioned it through its online platform.

28. V&P Motors LLC, a shell buyer with a history of cash purchases, purchased the wrecked Tesla for approximately $14,000.

29. On information and belief, V&P Motors paid cash and performed substandard, non-OEM ("aftermarket") structural repairs outside of certified collision protocols.

30. The improper repairs included welded frame patches, aftermarket bumper carriers, mismatched paint materials, improper radar mounting, and non-factory hood alignment.

31. These repairs rendered the vehicle structurally unsafe.

**B. Manheim's Failure to Disclose Total-Loss History**

32. After repairs, V&P Motors transported the vehicle to Manheim Anaheim California operated by Cox Automotive, Inc.

33. Manheim processed the vehicle into its dealer-only auction stream.

34. Despite having access to NMVTIS accident data, VIN flags, and Copart-sourced auction history, Manheim failed to disclose the vehicle's prior total-loss status.

35. Manheim listed the vehicle without salvage warning, structural damage disclosure, or prior total-loss notation.

36. Manheim permitted the vehicle to be sold to downstream dealers "AS IF" it were a clean-title car.

37. This omission enabled the dangerous vehicle to re-enter the retail market.

**C. Rohrman Automotive Group's Failure to Perform Legally Required Due Diligence**

38. Rohrman Automotive Group is the name for the parent company, a family of dealerships that includes the Gurnee Volkswagen dealership acquired the vehicle from Manheim.

39. Illinois law requires dealers to perform reasonable due diligence, including VIN history review and structural safety inspection.

40. A basic Google search of the VIN revealed all Copart salvage images and the total-loss designation.

41. Rohrman Automotive Group either failed to conduct even the lawful due diligence and/or intentionally concealed the damage as it did on a routine basis according to public reporting. Both acts are illegal under Illinois law.

42. The dealership listed the vehicle for sale as:
    - "Clean Title"
    - "No Catastrophic Accidents Reported"
    - "Flawless Condition"
    - "Mechanically Perfect"
    - "Still Under Tesla Warranty"

    43. All these representations were false.

43. **The Unauthorized Dealer Service Plan Scheme**

44. In addition to salvage concealment, the dealership employees operated an internal scheme to insert unauthorized "dealer service plans" into customer deals commonly known as a "DSP Scam."

45. Plaintiff's contract was stuffed with four DSP's totaling $6,274 in unwanted add-on products.

46. Sales staff would add these products without the customer's knowledge or consent, then send the contract to finance.

47. Finance manager David LaBahn confirmed that this was a routine practice pushed by sales managers.

48. General Sales Manager Nebi Denic, based on consumer complaints and manager admissions, coordinated the add-on program.

49. Over several months Plaintiff repeatedly requested removal of these add-ons, but the dealership ignored him.

### E. Plaintiff's Purchase Experience

50. On March 17, 2023, Plaintiff purchased the Tesla from Gurnee Volkswagen.

51. Plaintiff asked whether the vehicle had ever been in an accident; Tyler Stein replied, "No, minor front bumper damage on Carfax, no salvage issues. We would never sell a salvaged car."

52. Plaintiff relied on these statements when entering the transaction.

53. At no time did Stein, Denic, LaBahn, Perry, or any other employee disclose:
    - prior total-loss status,
    - Copart salvage history,
    - structural damage,
    - non-OEM reconstruction,
    - lost warranty coverage.

54. Plaintiff was presented with a contract containing concealed add-on plans he never agreed to.

55. The finance manager electronically signed the sales contract and placed it in the glove box as plaintiff had to rush to a critical doctors appointment.

### F. Post-Sale Discovery of Structural Danger

56. Within weeks, Plaintiff experienced steering vibration, brake noise, alignment pulling, and loss of range in the self driving technology.

57. Plaintiff brought the vehicle to a Tesla-approved collision center, The Ultimate Paint Shop for a minor accident to the fender.

58. Tesla-certified technicians concluded, photographed and analyzed the vehicle;
    - had major structural repair,
    - was improperly rebuilt making the technology obsolete;

- was unsafe to drive,
- should never have been sold,
- voided its Tesla warranties including access to Tesla Superchargers.

59. The shop confirmed they routinely flag dangerous salvage vehicles but found no record of Rohrman Automotive Group dealers or Manheim auction performing such checks.

## G. Systemic Concealment by Dealership Management

60. Plaintiff attempted to contact Gurnee VW and Rohrman Automotive Group CEO Ryan Rohrman for several months.
61. He called Stein, Perry and Nemic over 20 times but received no response.
62. He emailed Perry, Nemic and Corporate - no response.
63. He sent written dispute notice to Perry, Nemic and Rohrman but no response.
64. CEO Rohrman, General Manager Rocco Perry and General Sales Manager Nemic ignored every contact attempt including Illinois Attorney General's Fraud Unit
65. Corporate HR representative Crystal Zaba admitted by email (BBB) that Plaintiff had a valid fraud complaint and stated all employees have been notified and retrained.
66. Zaba ordered Perry to resolve the issue (DSP's) and told him to "cut a hard money check."
67. Perry called Plaintiff one time, acting nervous, promising a fix.
68. Perry referred plaintiff to the Rohrman website dedicated to refunding fraudulent DSP's.
69. During BBB arbitration, Zaba concealed the salvage file despite having it in her possession. Instead, Plaintiff received an email from the corporate attorney Levison blaming the plaintiff for signing the CARFAX report (CARFAX does not provide auction data).

## H. Discovery of Salvage History and Internet Evidence

70. Plaintiff independently discovered the salvage history by performing a basic Google search of the VIN.

71. Copart images showed every detail of the catastrophic impact, confirming the vehicle was totaled.

72. The VIN also matched Hertz's total-loss database entry.

73. Plaintiff learned the vehicle had been sold at least three times across state lines before reaching Rohrman.

74. This pattern is consistent with known title-washing practices.

## I. Damages and Harm to Plaintiff

75. Plaintiff paid full retail price for a worthless vehicle specifically to use for rideshare.

76. He incurred thousands in inspection costs and lost earnings over 24 months due to unsafe driving conditions e.g. HVAC failures.

77. On February 1, 2025, the Tesla became his shelter due to homelessness; structural defects made it dangerous even to live in e.g. no AC or heating due to climate control failures.

78. Plaintiff was financially devastated, leading to his bankruptcy filing. Discharged Nov 17, 2025.

79. Plaintiff was already a disabled Army Veteran suffering from two ADA disabilities (PTSD and under the care of a spinal surgeon). The distress, physical risk, and loss of income was devastating.

80. Plaintiff's damages exceed $214,000,000 including punitive damages and future damage compensation.

# COUNT I — VIOLATION OF THE ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT

(815 ILCS 505/1 et seq.)

81. Plaintiff incorporates ¶1–80 as though fully restated herein.

82. Defendants engaged in "unfair or deceptive acts or practices" in trade or commerce.

83. Defendants misrepresented the vehicle as clean-title, accident-free, structurally sound, and warrantied.

84. Defendants omitted material facts including the vehicle's prior total-loss status, structural compromise, and voided warranty.

85. Defendants inserted unauthorized service plans totaling $6,274 into the sales contract without Plaintiff's consent.

86. These omissions and misrepresentations were intended to induce Plaintiff to purchase the vehicle.

87. Plaintiff relied on these misrepresentations when purchasing the Tesla.

88. Defendants' conduct was immoral, unethical, oppressive, and unscrupulous.

89. Plaintiff has suffered actual damages including economic loss, loss of use, inspection costs, and diminished property value.

90. Defendants' conduct was willful and malicious.

91. Plaintiff is entitled to compensatory damages, statutory damages, and attorney's fees under ICFA.

## COUNT II — COMMON-LAW FRAUD

92. Plaintiff incorporates ¶1–91.
93. Defendants knowingly made false statements of material fact.
94. These included explicit statements that the vehicle was accident-free, safe, warrantied, and structurally sound.
95. Defendants also represented the contract as accurate despite stuffing unauthorized add-ons into the agreement.
96. Defendants concealed the salvage and total-loss history.
97. Defendants knew these statements were false at the time they were made.
98. Defendants intended Plaintiff to rely on their false statements to induce purchase.
99. Plaintiff justifiably relied on Defendants' representations.
100. Plaintiff suffered injury as a direct result of this fraud.
101. Plaintiff is entitled to rescission, restitution, and punitive damages.

## COUNT III — FRAUDULENT CONCEALMENT

102. Plaintiff incorporates ¶1–101.
103. Defendants possessed exclusive knowledge of the vehicle's salvage history and structural damage.
104. Defendants had a duty to disclose these facts because:
105. they related to a latent defect not discoverable by ordinary inspection,
106. Defendants had superior knowledge,
107. Plaintiff made direct inquiries about vehicle history.
108. Defendants intentionally concealed these facts.
109. Defendants further concealed the fact that the Tesla's factory warranty was void.
110. General Manager Perry and Corporate Agent Zaba knowingly withheld salvage documentation during BBB arbitration.

108. Plaintiff relied on Defendants' concealment to his detriment.

109. Plaintiff suffered damages including purchase price, loss of earnings, repair expenses, and safety risks.

110. Defendants' conduct was fraudulent, malicious, and done in conscious disregard for Plaintiff's rights.

## COUNT IV — NEGLIGENT MISREPRESENTATION

111. Plaintiff incorporates ¶1–110.

112. Defendants, in the course of their business, supplied false information for Plaintiff's guidance in a sales transaction.

113. These misrepresentations included the vehicle's condition, history, warranty status, and contract contents.

114. Defendants failed to exercise reasonable care in communicating accurate information.

115. Plaintiff justifiably relied on Defendants' representations.

116. Plaintiff suffered damages as a direct and proximate result.

117. Defendants are liable for negligent misrepresentation.

## COUNT V — BREACH OF WARRANTY / MAGNUSON-MOSS WARRANTY ACT

(15 U.S.C. § 2301 et seq.)

118. Plaintiff incorporates ¶1–117.

119. Defendants advertised the vehicle as carrying remaining Tesla factory warranty.

120. This representation formed a written warranty under the MMWA.

121. The Tesla's warranty was void due to salvage designation and structural compromise.

122. Defendants breached the implied warranty of merchantability.

123. A structurally unsafe, improperly repaired, total-loss vehicle is not "fit for ordinary purposes."

124. Plaintiff was entitled to receive a safe, operable vehicle fit for transportation.

125. Defendants violated the Magnuson-Moss Warranty Act and the Illinois UCC.

126. Plaintiff is entitled to damages, revocation of acceptance, and attorney's fees.

## COUNT VI — CIVIL CONSPIRACY

127. Plaintiff incorporates ¶1–126.

128. Defendants knowingly agreed, explicitly or implicitly, to participate in a coordinated scheme to defraud consumers.

129. Overt acts included:
- acquiring salvage vehicles through title-washing channels,
- concealing structural history,
- inserting unauthorized service plans,
- withholding documents from Plaintiff,
- ignoring complaint attempts,
- presenting false information during arbitration.

130. Each Defendant performed one or more overt acts in furtherance of the conspiracy.

131. The conspiracy directly caused Plaintiff's damages.

132. Plaintiff is entitled to damages jointly and severally.

## COUNT VII — NEGLIGENT SUPERVISION
(Corporate Defendants)

133. Plaintiff incorporates ¶1–132.

134. Corporate Defendants owed a duty to properly supervise sales, finance, arbitration, and vehicle-acquisition personnel.

135. Corporate Defendants failed to provide proper training, oversight, and enforcement of compliance policies.

136. The dealership had a known pattern of fraud complaints involving GSM Denic and others.

137. Corporate Defendants permitted systemic misconduct to continue.

138. This failure directly enabled the fraud that harmed Plaintiff.

139. Corporate Defendants are liable for negligent supervision.

## COUNT VIII — NEGLIGENCE (MANHEIM AUCTIONS / COX AUTOMOTIVE)

140. Plaintiff incorporates ¶1–139.

141. Manheim owed a duty of reasonable care when processing vehicles entering its auction stream.

142. Manheim had access to NMVTIS, Copart salvage data, and VIN-linked total-loss flags.

143. Manheim breached its duty by failing to disclose the Tesla's salvage history.

144. Manheim's failure materially contributed to the vehicle's resale as a clean-title car.

145. Plaintiff suffered damages as a result.

146. Manheim is liable for negligence.

## COUNT IX — PUNITIVE DAMAGES

147. Plaintiff incorporates ¶1–146.

148. Defendants' conduct was willful, malicious, and executed with reckless disregard for human safety.

149. Defendants engaged in intentional fraud involving concealment of a dangerously repaired vehicle.

150. Punitive damages are appropriate to deter future misconduct.

151. Plaintiff seeks punitive damages against each Defendant according to their individual roles.

## PRAYER FOR RELIEF

152. Plaintiff requests judgment in his favor and against all Defendants jointly and severally for:
- compensatory damages exceeding $214,000,000;
- punitive damages;
- rescission of the sales contract;
- restitution and refund;
- attorney's fees and costs;
- any further relief deemed just and proper.

**JURY DEMAND**

153. Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

/s/ John R. Smith

John R. Smith

Pro Se Plaintiff

1400 Patriot Blvd., Unit 291

Glenview, Illinois 60025

Phone: 480-486-2902

Email: zuika@usa.com

Date: 12/01/2025

I, John R. Smith, hereby declare under penalty of perjury that the statements contained in this Complaint are true and correct to the best of my knowledge and belief.

Executed on this __1__ day of __DEC__, 2025.

/s/ John R. Smith

John R. Smith

Under 28 U.S.C. § 1915 and Federal Rule of Civil Procedure 4(c)(3):

If Plaintiff's IFP application is granted, the U.S. Marshals Service must affect service on each defendant at Plaintiff's direction.

Summonses and USM-285 forms will be provided as part of the filing packet.

Plaintiff respectfully requests that this Court enter judgment in his favor, award the relief described above, and grant any other or further relief the Court deems just and proper

# EXHIBIT INDEX

### Exhibit A – Hertz Total-Loss Documentation

- Total-loss authorization
- Repair estimate exceeding $24,000
- The Hertz salvage speciaist who authorized disposal and Hertz in house councils admissions

### Exhibit B – Copart Salvage Records
- Full salvage photo set
- Condition report
- Pre-repair structural images
- Auction listing
- Buyer information (V&P Motors LLC)

### Exhibit C – Manheim Auction Documents
- Auction listing
- VIN pull
- Gate pass
- Title status screen
- Any available CR (Condition Report)

### Exhibit D – Tesla Certified Body Shop Findings
- Structural damage report
- Confirmation of non-OEM repairs
- Unsafe condition statement
- Warranty void documentation

4. *Cash and bank accounts*: Do you and/or your spouse have any money in cash or in a checking or savings account? ☐ Yes ☑ No  If yes, how much? _____

5. *Other assets*: Do you and/or your spouse own or have an interest in any real estate (including your home), stocks, bonds, other securities, retirement plans, automobiles, jewelry, or other valuable property (not including ordinary household furnishings and clothing)? ☐ Yes ☑ No

   If yes, list each item of property and state its approximate value:

   _____
   _____
   _____

6. *Dependents*: Is anyone dependent on you and/or your spouse for support? ☐ Yes ☑ No

   If yes, please list their names (for minor children, use only initials); relationship to you; and how much you and/or your spouse contribute toward their support each month:

   _____
   _____

7. *Debts and financial obligations*: List any amounts you owe to others:
   Bankruptcy discharge 11/14/2025
   _____

8. *Provide any other information that will help explain why you cannot afford to pay court fees / hire an attorney*:
   I began living in my car 1 February, 2025 desperately trying not to ruin my future.
   Christy Fieber SSVF Case Manager 630-871-8387 EXT. 634 Christy@MSHV.org
   www.helpaveteran.org Working to end veteran homelessness.

**Declaration**: I declare under penalty of perjury that all of the information listed above is true and correct. I understand that a false statement may result in dismissal of my claims or other sanctions.

Date: 12/01/2025

*Applicant's signature*

John Richard Smith
*Printed name*